**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JOSEPH WIESEL<br>Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| APPLE INC.<br>Defendant. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff DR. JOSEPH WIESEL ("Dr. Wiesel" or "Plaintiff"), by and through his attorneys, hereby alleges for his Complaint for Patent Infringement against Apple Inc. ("Apple" or "Defendant") on personal knowledge as to his own activities and on information and belief as to all other matters, as follows:

## PROCEDURAL HISTORY AND LIMITED PURPOSE OF THIS FILING

1. Dr. Wiesel previously filed suit against Apple Inc. in this Court on December 27, 2019, Civil Action No. 2:19-cv-07261, asserting infringement of the '514 Patent based on the same accused products and the same operative facts alleged herein. That action was dismissed on August 11, 2025. Dr. Wiesel timely appealed the dismissal to the United States Court of Appeals for the Federal Circuit, Case No. 25-2073. That appeal remains pending.

2. Dr. Wiesel maintains the positions set forth in his appellate briefing and continues to contend that dismissal under § 281 and Rule 19 was erroneous. This filing does not concede the correctness of that ruling. Rather, it is undertaken solely as a protective measure.

3. After the dismissal, Dr. Wiesel and Microlife Corporation ("MLC") amended

their license agreement to remove any provisions that could be construed as limiting Dr. Wiesel's independent enforcement authority with respect to the '514 Patent. Specifically, the amendment eliminates any non-exclusive license or sublicense rights in the '514 Patent, removes any consent, transfer, or restriction provisions affecting Dr. Wiesel's ability to license, assign, or enforce the patent, deletes prior negotiation or injunctive-relief provisions that could be interpreted as encumbering enforcement discretion, and clarifies that MLC has no enforcement role of any kind. The agreement expressly confirms that no ownership, control, or enforcement rights in the '514 Patent were conveyed to MLC and that Dr. Wiesel retains the sole and exclusive right to bring suit, including the right to recover accrued past damages. As amended, MLC holds no licensing, ownership, control, or enforcement interest in the '514 Patent that would require joinder in this action.

4. This Complaint is filed solely to preserve Dr. Wiesel's right to recover damages under 35 U.S.C. § 286. Section 286 limits recovery to infringement occurring within six years prior to the filing of a complaint. Because the prior action was dismissed and remains on appeal, time continues to run during the appellate process, and in the event that the Federal Circuit reverses the invalidity ruling but affirms dismissal under § 281 or Rule 19, Dr. Wiesel would be required to proceed under a different set of base facts resolving any issues related to § 281 or Rule 19 through an amended license agreement with MLC. In such a scenario, and without this complaint, damages accruing during the pendency of the appeal could fall outside the six-year statutory period and be permanently unrecoverable.

5. To be clear, this filing is simply a protective measure. It is not intended to proceed on the merits while the appeal remains pending. If Dr. Wiesel is fully successful on appeal, this Complaint will be unnecessary and will be voluntarily dismissed by Plaintiff. If

the Federal Circuit affirms the invalidity ruling, this Complaint will likewise be voluntarily dismissed by Plaintiff. It will proceed only if the Federal Circuit reinstates the patent's validity but does not reverse the dismissal under § 281 or Rule 19, in which event this pleading may be necessary to preserve damages within the statutory period.

6. This filing is made without waiver of any rights in the pending appeal. Dr. Wiesel expressly reserves all rights to seek reinstatement of the original action including possible amendment of the pleadings therein for potential preservation of the December 27, 2019 filing date for purposes of damages should the Federal Circuit reverse the dismissal. Nothing in this filing constitutes an election of remedies, a concession that a new action is required, or a waiver of any argument that the original filing date governs the applicable damages period.

7. For the reasons explained above, Plaintiff intends to quickly seek a stay of this action to avoid duplicative proceedings and to promote judicial economy.

## NATURE OF THE ACTION

8. This action arises under 35 U.S.C. § 271 for Defendant's infringement of Dr. Wiesel's U.S. Patent No. 7,020,514 (the "'514 Patent").

## PARTIES

9. Plaintiff is an individual who resides in the Eastern District of New York, in West Hempstead, New York. Plaintiff is a citizen of New York and conducts professional activities in New York.

10. Upon information and belief, Defendant Apple is a Delaware corporation with a place of business at 1 Infinite Loop, Cupertino, California 95014. Apple may be served with process through its registered agent for service in New York: CT Corporation System, 28 Liberty

St., New York, New York 10005.

**JURISDICTION AND VENUE**

11. This is an action for patent infringement arising under the provisions of the Patent Laws of the United States of America, Title 35 of the United States Code, §§ 100, *et seq*.

12. Subject matter jurisdiction over Dr. Wiesel's claims is conferred upon this Court by 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(a) (patent jurisdiction).

13. This Court also has personal jurisdiction over Apple because, upon information and belief, Apple has committed acts giving rise to this action within New York and within this District. Apple markets, sells, and/or offers for sale the Accused Products (defined *infra*) nationally, including to New York, including through physical retail stores located within this district, and therefore, Apple has established minimum contacts with this forum. Apple also regularly conducts business in this forum, engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided in this District and in New York, demonstrating that Apple has purposefully established substantial, continuous and systematic contacts with New York.

14. The exercise of personal jurisdiction comports with Apple's right to due process, because it has purposefully availed itself of the privilege of conducting activities nationally, including within the Eastern District of New York, such that it should reasonably anticipate being hailed into court here.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and § 1400(b) at least because Plaintiff resides and works within this District, and Defendant, upon information and belief, has established places of business in this District, including at 123 Flatbush Avenue, Brooklyn, NY 11217 and 247 Bedford Avenue, Brooklyn, New York 11211, transacts

business within this district, including one or more acts of making, selling, using, importing and/or offering for sale infringing products or providing support service to Apple's customers in this District, thus committing acts in this district giving rise to this action.

## THE PATENT-IN-SUIT

16. The '514 Patent, entitled "Method of and apparatus for detecting atrial fibrillation," was duly and legally issued by the United States Patent and Trademark Office on March 28, 2006. A true and correct copy of the '514 Patent is attached as Exhibit A.

17. Dr. Wiesel is the inventor and owner of the '514 Patent, with retained rights to enforce and recover for any and all infringement thereof.

18. All necessary maintenance fees for the '514 Patent have been timely paid in full. The '514 Patent is valid and enforceable.

## DR. WIESEL'S BACKGROUND

19. Dr. Wiesel is a board-certified cardiologist, having practiced medicine for over thirty years. He is currently a Clinical Assistant Professor of Cardiology at NYU School of Medicine. Early on in his career, Wiesel noticed a lack of available and useful technology to screen for atrial fibrillation. For over twenty years, Plaintiff has been inventing, researching and experimenting with innovative approaches for monitoring and detecting atrial fibrillation.

20. Dr. Wiesel has filed numerous patent applications relating to atrial fibrillation detection, including his first application filed in December 1999 (at a time when Apple was just a computer company called Apple Computer, Inc., well before the introduction of the Apple Watch, iPhone, or even the iPod). To date, Dr. Wiesel has been issued five patents, and additional applications directed to detection of atrial fibrillation are currently pending. Dr. Wiesel invented and perfected a method and device for detecting atrial fibrillation by assessing whether a pulse rate

pattern is regular or irregular, using sphygmomanometry or photoplethysmography. This innovative approach allowed patients to properly monitor atrial fibrillation in a non-hospital setting. Prior to this, patients could only use manual palpation of the pulse to detect atrial fibrillation. Manual palpation was rudimentary and prone to inaccuracy, especially as it was performed by patients at home or elsewhere and not by medical professionals. Dr. Wiesel's innovations, as described in the patent-in-suit, were pioneering steps in atrial fibrillation detection.

## THE ACCUSED APPLE WATCH PRODUCTS

21. Upon information and belief, Defendant manufactures and sells a wristwatch device, the Apple Watch ("Apple Watch" or "Watch"), and recognizes the importance of monitoring and detecting atrial fibrillation. Since at least December 6, 2018, Apple has been publicly selling the Apple Watch Series 4 ("Series 4"), which includes an irregular pulse notification feature that checks the pulse rhythm and sends a notification if atrial fibrillation is detected.

22. Upon information and belief, since at least as early as September 16, 2016, Apple has been publicly selling the Apple Watch Series 1 and Series 2. Upon information and belief, since at least as early as September 22, 2017, Apple has been publicly selling the Apple Watch Series 3.

23. Upon information and belief, upon the release of the Series 4, or shortly thereafter, certain prior versions of the Apple Watch (namely, the Apple Watch Series 1-3) were provided with a software upgrade that provides irregular pulse notifications resulting from checking a pulse rhythm. See Exhibit B, Apple support materials entitled "Heart rate notifications on your Apple Watch", dated September 19, 2019, a printout thereof attached herein. (also accessible at https://support.apple.com/en-us/HT208931).

24. Since at least as early as September 20, 2019, Apple has been publicly selling the Apple Watch Series 5.

25. Defendant has emphasized the importance of atrial fibrillation detection as a feature in the Apple Watch in its marketing and support documentation.

26. Upon information and belief, the Apple Watch Series 1-5 incorporate features claimed in the ’514 Patent.

## DEFENDANT’S WILLFUL ACTS

27. Since at least as early as September 20, 2017, before the launch of the Series 4, Apple has had indisputable actual knowledge of Dr. Wiesel’s ’514 Patent.

28. Following an initial notice letter on or about September 20, 2017, Dr. Wiesel engaged Apple through numerous letters and claim charts, in which Dr. Wiesel informed Apple in detail that the Accused Products infringe the ’514 Patent.

29. Defendant has refused to negotiate in good faith to avoid this lawsuit even after Dr. Wiesel provided Apple detailed claim charts highlighting the elements of Dr. Wiesel’s patent and mapping them to elements of Apple’s Watch products.

30. All of Defendant’s infringing activities have been done at least since that date with knowledge, understanding and appreciation of the ’514 Patent, and the rights this patent bestows on Dr. Wiesel.

31. Moreover, Defendant has continued in a course of conduct without taking sufficient steps to ensure the non-infringement of the ’514 Patent by, *inter alia*, launching not one but two new infringing products, the Apple Watch Series 4 and Series 5, but also updating the software on the existing legacy Series 1, 2, and 3 Apple Watches to enable the infringing features.

32. Defendant’s actions, despite continued warnings by Dr. Wiesel, evidence a willful

disregard of Dr. Wiesel's rights vis-à-vis the '514 Patent and a desire to profit irrespective of U.S. patent laws.

**COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 7,020,514**

33. Dr. Wiesel re-alleges and incorporates the allegations in each of the preceding paragraphs as if fully set forth herein.

34. Independent claim 1 of the '514 Patent recites, for example, a method of determining possible atrial fibrillation. The method comprises the step of detecting irregular pulse rhythms from a succession of time intervals. Each succession of time intervals corresponding to a respective interval of time between successive pulse beats of a sequence of the pulse beats. The method further comprises the step of analyzing the detected irregular pulse rhythms to make a determination of possible atrial fibrillation. The method further comprises indicating the possible atrial fibrillation from the determination.

35. Dependent claim 7 of the '514 Patent further recites, for example, the method further including detecting the irregular pulse rhythms by monitoring changes in light transmitted through a body appendage of the individual.

36. Dependent claim 10 of the '514 Patent further recites, for example, the indication of possible atrial fibrillation further including outputting an indication that is indicative of the possible atrial fibrillation. The outputting is to a device selected from a group consisting of a printer, a display, an auditory signal generator and a vibration signal.

37. Independent claim 12 of the '514 Patent recites, for example, an apparatus for determining possible atrial fibrillation. The apparatus includes a detector configured to detect irregular pulse rhythms from a succession of time intervals. Each of the succession of time intervals corresponds to a respective interval of time between successive pulse beats of a sequence

of pulse beats. The apparatus includes a processor configured to analyze the detected irregular rhythms and make a determination of possible atrial fibrillation. The apparatus further includes an indicator configured to indicate the possible atrial fibrillation based on the detection.

38. Dependent claim 16 of the '514 Patent further recites, for example the detector configured to detect irregular pulse rhythms. The irregular pulse rhythms are detected by monitoring changes in light transmitted through a body appendage of the individual.

39. Dependent claim 17 of the '514 Patent further recites, for example the indicator providing an indication of possible atrial fibrillation. The indicator includes an output device selected from a group consisting of a printer, a display, an auditory signal generator and a vibration signal. The output device is configured to output an indication indicative of the possible atrial fibrillation.

40. Dependent claim 18 of the '514 Patent further recites, for example, the processor including at least one of a microprocessor, an application specific integrated circuit (ASIC), a programmable logic array (PLA) and a reduced instruction set chip (RISC).

41. Defendant makes, uses, sells, offers to sell, and/or imports into the United States the Apple Watch Series 1-5, a watch/smartwatch that provides "irregular rhythm notifications" to help "patients identify early warning signs" (the "Accused Products").

42. Dr. Wiesel's patented technology is a critical part of the Apple Watch and is used to drive customer demand. Apple's Chief Operating Officer Jeff Williams, at Apple's September 12, 2018 Launch Event Keynote, announced a new Apple Watch feature using the "essential" optical heart sensor of the Apple Watch. "The Second feature is related to heart rhythm, and this is a big deal. Apple Watch can now screen your heart rhythm in the background, and it sends you a notification if it detects an irregular rhythm that appears to be atrial fibrillation." See

https://singjupost.com/apple-september-12-2018-event-keynote-full-transcript/15/?amp=1&pdf=12183&singlepage=1 (See page 8 of a printout thereof attached as Exhibit C). The Accused Products include, without limitation, the Apple Watch Series 1-5, and all variations known to Plaintiff. The Accused Products incorporate the features claimed in numerous claims in the '514 Patent.

43. The Accused Products utilize a photoplethysmography ("PPG") sensor to detect atrial fibrillation. See Apple's DEN180042 submission to the Food and Drug Administration, "De Novo Classification Request For Irregular Rhythm Notification Feature", a printout thereof attached herein as Exhibit D. (also accessible at https://www.accessdata.fda.gov/cdrh_docs/reviews/DEN180042.pdf).

44. The Accused Products incorporate a PPG sensor that is able "to identify episodes of irregular heart rhythms consistent with atrial fibrillation" by "individual pulses when they reach the periphery and thereby measure the beat-to-beat intervals." See Id at page 3. Therefore, the Accused Products, as explained by Defendant to the FDA, detect and analyze irregular pulse rhythms for determination of atrial fibrillation, in a "one-minute beat-to-beat sequence." Id. Based on Apple's representations to the FDA, the irregular rhythm notification feature was been granted De Novo classification by the FDA for users 22 years and older in the U.S. with no prior history of AFib. See Id.

45. The Accused Products include a method for monitoring changes in light transmitted through an appendage, in order to detect irregular pulse rhythms. In Apple's FDA submission, it discusses the use of green LED lights as part of the PPG, which monitors light changes "to identify episodes of irregular heart rhythms consistent with atrial fibrillation." See Id., at page 3.

46. The claims of the '514 Patent, including infringed claims 1, 7, 10, 12, and 16-18,

when viewed as a whole, including as an ordered combination, are not merely well-understood, routine, or conventional steps, technologies or components. The claimed inventions were not well known, routine, or conventional at the time of the invention, nearly twenty years ago, and represent specific improvements over the prior art and prior existing systems and methods, as discussed in the ’514 Patent.

47. A device embodying the claims of the ’514 Patent is intended to be used at home, by a layperson, to detect possible atrial fibrillation. Claim 1 recites detecting irregular pulse rhythms by determining the time interval between each irregular pulse beat and the following beat. However, this time interval cannot be measured without the use of an electronic device (such as the accused Apple Watch), as the time interval is in fractions of a second. An electronic device is thus needed to detect irregular pulse rhythms, as well as analyze and determine possible atrial fibrillation.

48. The use of PPG to detect atrial fibrillation is also not abstract, and even if it were, the invention of the ’514 Patent adds a specific concrete implementation to solve a specific problem. See, e.g., ’514 patent (col.5 ll.57-60). Moreover, as the ’514 Patent explains, at the time of the filing of the application, devices that detected an irregular heartbeat pattern to determine possible atrial fibrillation did not exist and thus the features were clearly not well-understood, routine or conventional activities: “There are several devices available that measure both blood pressure and pulse rate, but none of these devices is capable of monitoring, detecting and/or communicating whether or not an irregular heartbeat pattern is present to indicate possible atrial fibrillation. The commercially available devices measure the number of pulse beats over a preset time interval, usually ten (10) seconds, but these devices neither analyze nor determine the presence of irregular heartbeat rhythms.” ’514 Patent (col.3 ll.33-41).

49. Further, claim 7 recites the use of light source transmitted through an appendage to monitor changes of light. This cannot be done manually, requiring the use of a PPG to implement. Monitoring changes in light transmitted through a body appendage of an individual to detect irregular pulse rhythms is not a well-understood, routine, or conventional activity; nor was it so at the time of filing of the application that issued as the ’514 Patent. Moreover, the combination of all elements of dependent claim 7 is and was not a well-understood, routine, or conventional activity at the time of filing of the application.

50. Defendant has made, and continues to make, atrial fibrillation detection a highlighted feature of the Apple Watch. In November 2017, Apple sponsored a heart study, carried out by Stanford Medical School, to demonstrate the ability of wearable technology to detect atrial fibrillation. (A printout of an Article in Stamford Medicine, titled “Apple Heart Study demonstrates ability of wearable technology to detect atrial fibrillation”, dated March 16, 2019, is attached as Exhibit E.) As shown in Exhibit E, Apple’s study was the largest cardiac clinical trial ever performed, with 400,000 subjects. Apple undertook this massive study to prove that the Apple Watch can effectively detect atrial fibrillation.

51. In addition to the heart study, Apple has heavily marketed atrial fibrillation detection as a key feature of the Series 4 and 5 (and updated Series 1, 2, and 3) watches and highlighted the Apple Watches’ ability to receive irregular rhythm notifications not only to end users, but also to healthcare providers. Attached at Exhibit F is a printout of Apple marketing materials directed to healthcare providers entitled, “Apple Watch. Helping your patients identify early warning signs”. Apple explains that the “[i]rregular rhythm notifications use the optical heart sensor to detect the pulse wave at the wrist and look for variability in beat-to-beat intervals when the user is at rest. If the algorithm repeatedly detects an irregular rhythm suggestive of AFib, your

patient will receive a notification and the date, time, and beat-to-beat heart rate will be recorded in the Health app." See Id at page 2.

52. Defendant's Apple Watch Series 4 is advertised as being able to "identify[] abnormal pulse rates that may suggest the presence of atrial fibrillation," with these detections occurring using an optical sensor to determine light transmission through an appendage. See Exhibit D.

## Compare Apple Watch Models

| | High Heart Rate Notification | Low Heart Rate Notification | Irregular Rhythm Notification | ECG App | Fall Detection |
|---|---|---|---|---|---|
| Sensors | Optical heart sensor / PPG | Optical heart sensor / PPG | Optical heart sensor / PPG | Electrical heart sensor / electrodes | Next generation accelerometer and gyroscope |
| Apple Watch Series 1, 2, 3 | ✓ | ✓ | ✓ | ✗ | ✗ |
| Apple Watch Series 4 | ✓ | ✓ | ✓ | ✓ | ✓ |

*Note: Original Apple Watch does not support these functions

See *Id*.

53. This features of course continued in the Series 5. "Unusually high or low heart rates and irregular heart rhythms (known as arrhythmias) could be signs of a serious condition….With notifications in the Heart Rate app, Apple Watch Series 5 can check your heart and alert you to these irregularities." See Exhibit G, marketing materials for the Apple Watch Series 5, a printout of which is attached.

54. It is estimated that, to date, Apple has sold between 50 million – 100 million watches with either this functionality prepackaged, or available as a downloadable upgrade. It is estimated that an additional 30 million – 40 million watches will be sold with this functionality by the time the '514 Patent expires.

55. The Accused Products include a method of determining possible atrial fibrillation. For example, Defendant states that the Apple Watch includes the ability to "screen your heart rhythm in the background and it sends you a notification if it detects an irregular rhythm that appears to be atrial fibrillation." See Exhibit C. The Accused Products include detecting irregular pulse rhythms from a succession of time intervals each corresponding to a respective interval of time between successive pulse beats of a sequence of pulse beats. For example, Defendant states:

The optical heart sensor in Apple Watch uses what is known as photoplethysmography. This technology, while difficult to pronounce, is based on a very simple fact: Blood is red because it reflects red light and absorbs green light. Apple Watch uses green LED lights paired with light-sensitive photodiodes to detect the amount of blood flowing through your wrist at any given moment. When your heart beats, the blood flow in your wrist — and the green light absorption — is greater. Between beats, it's less. By flashing its LED lights hundreds of times per second, Apple Watch can calculate the number of times the heart beats each minute — your heart rate. The optical heart sensor supports a range of 30–210 beats per minute. In addition, the optical heart sensor is designed to compensate for low signal levels by increasing both LED brightness and sampling rate.

The optical heart sensor can also use infrared light. This mode is what Apple Watch uses when it measures your heart rate in the background, and for heart rate notifications. Apple Watch uses green LED lights to measure your heart rate during workouts and Breathe sessions, and to calculate walking average and Heart Rate Variability (HRV).

See Exhibit H, page 2, Apple support materials entitled "Your heart rate. What it means and where on Apple Watch you'll find it", dated September 19, 2019, a printout thereof attached herein. (also accessible at https://support.apple.com/en-us/HT204666).

56. Apple support materials continue to explain:

Your Apple Watch will occasionally look at your heart beat to check for an irregular rhythm that might be atrial fibrillation (AFib)… AFib is a type of irregular heart rhythm. AFib occurs when the heart beats in an irregular pattern. It's a common form of irregular heart rhythm where the upper chambers of the heart beat out of sync with the lower chambers.

(See Exhibit B at page 1).

57. The Accused Products further include analyzing the detected irregular pulse rhythms to make a determination of possible atrial fibrillation. For example, Defendant states that the Apple Watch can "screen your heart rhythm in the background and it sends you a notification if it detects an irregular rhythm that appears to be atrial fibrillation." See Exhibit C, p. 8 of the printout. The Accused Products further include indicating the possible atrial fibrillation from the determination. For example, Defendant states that the Apple Watch "alert you to these irregularities," and "can indicate whether your heart rhythm shows signs of atrial fibrillation." Exhibit G.

58. The Accused Products further include detecting the irregular pulse rhythms by monitoring changes in light transmitted through a body appendage of the individual. For example, Defendant states that the Watch's "optical sensor uses green LED lights paired with light sensitive photodiodes to detect blood volume pulses in a user's wrist using photoplethysmography. These sensors and underlying algorithms are the basis for the heart rate and heart rate variability (HRV) detection" and "to determine HRV, Apple watch captures a tachogram…each tachogram is classified…to determine if an irregular rhythm may be present." See Exhibit I, page 3, Apple support materials entitled "Using Apple Watch for Arrythmia Detections", dated December 2018 (also accessible at https://www.apple.com/healthcare/site/docs/Apple_Watch_Arrhythmia_Detection.pdf).

59. The Accused Products further include outputting an indication of the possible atrial fibrillation by outputting to a device selected from a group consisting of a printer, a display, an auditory signal generator and a vibration signal. For example, Defendant illustrates that notifications may be shown as a display, indicating irregular rhythms. See Exhibit B, p. 2.

60. The Accused Products further include the processor including at least one of a microprocessor, an application specific integrated circuit (ASIC), a programmable logic array (PLA) and a reduced instruction set chip (RISC). Upon information and belief, Apple's processor in the Apple Watch includes an ASIC.

61. Therefore, the Accused Products meet all of the limitations of at least claims 1, 7, 10, 12, and 16-18 of the '514 Patent, literally or under the doctrine of equivalents.

**Willful Infringement**

62. Dr. Wiesel re-alleges and incorporates the allegations in each of the preceding paragraphs as if fully set forth herein.

63. Upon information and belief, all of Defendant's infringing activities have been done with knowledge, understanding and appreciation of the '514 Patent, and the rights this patent bestows on Dr. Wiesel.

64. Upon information and belief, Defendant has known about the '514 Patent, and their pertinence to their business activities, for several years.

65. For at least the past two years, rejecting all serious offers to discuss a resolution of this dispute, Defendant has continued in a course of conduct without taking sufficient steps to ensure the non-infringement of the claims of the '514 Patent by, inter alia, continuing to sell, offer for sale and manufacture products whose use in the manner directed by Defendant infringes the

’514 Patent.

66. Defendant’s actions, in spite of continued warnings by Dr. Wiesel, evidence a willful disregard of Dr. Wiesel’s rights vis-à-vis the ’514 Patent and a desire to profit irrespective of U.S. patent laws.

67. Defendant’s acts of infringement have caused and will continue to cause substantial and irreparable damage to Dr. Wiesel.

68. Plaintiff has no adequate remedy at law for Apple’s infringement of the ’514 Patent.

69. Upon information and belief, Apple’s infringement of the claims of the ’514 Patent will continue unless enjoined by this Court.

## DAMAGES

70. On information and belief, 35 U.S.C. § 287(a) was complied with at all relevant times.

71. Dr. Wiesel has sustained damages as a direct and proximate result of Defendant’s infringement of the ’514 Patent.

72. As a consequence of Defendant’s past infringement of the ’514 Patent, Dr. Wiesel is entitled to the recovery of past damages in the form of, at a minimum, a reasonable royalty.

73. As a consequence of Defendant’s continued and future infringement of the ’514 Patent, Dr. Wiesel is entitled to royalties for its infringement of the ’514 Patent on a going-forward basis.

74. Defendant’s infringement of the ’514 Patent has been and continues to be willful, intentional, and deliberate. Apple knew or should have known that making, having made, using, offering to sell, selling, and/or importing the Accused Products would directly infringe the ’514 Patent; yet Apple infringed and continues to infringe the ’514 patent.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Wiesel respectfully requests that this Court enter judgment against Defendant as follows:

A. Adjudge that Defendant has infringed at least claims 1, 7, 10, 12, and 16-18 of U.S. Patent No. 7,020,514, in violation of 35 U.S.C. §§ 271(a) and (b);

B. Award a permanent injunction enjoining Apple and its affiliates, officers, agents, employees, attorneys, and all other persons acting in concert with Apple, from infringing U.S. Patent No. 7,020,514;

C. Award damages to be paid by Defendant adequate to compensate Dr. Wiesel for Defendant's past willful infringement and any continuing or future infringement up until the date such judgment is entered, and in no event less than a reasonable royalty, including interest, costs and disbursements pursuant to 35 U.S.C. § 284 and, if necessary to adequately compensate Plaintiff for Defendant's infringement, an accounting of all infringing sales including without limitation those sales not presented at trial;

D. Order for Defendant to continue to pay royalties to Dr. Wiesel for infringement of U.S. Patent No. 7,020,514, on a going-forward basis at an increased amount to account for willfulness;

E. Award Dr. Wiesel treble damages based on any infringement found to be willful pursuant to 35 U.S.C. § 284;

F. Adjudge that Defendant willfully infringed the patent-in-suit and this case be exceptional under 35 U.S.C. § 285 and award enhanced damages, including costs and attorneys' fees, to Dr. Wiesel;

G. Award Dr. Wiesel pre-judgment and post-judgment interest at the maximum rate

permitted by law on his damages; and

H. Grant Dr. Wiesel such further relief as this Court deems just and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: March 12, 2026
New York, NY

Respectfully Submitted,
**BOCHNER PLLC**

/s/ *Serge Krimnus*
Serge Krimnus, Esq.
Paul Fraulo, Esq.
1040 Ave. of the Americas, 15th Fl.
New York, New York 10018
(646) 971-0685
serge@bochner.law
paul@bochner.law
*Attorneys for Plaintiff*